AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>MARLON PALCONIT RAMOS | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**17MJ02624** |

Complaint for violation of Title 21, United States Code, Section 1708

| NAME OF MAGISTRATE JUDGE<br>HONORABLE CHARLES EICK | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>September 28, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>OCT 19 2017<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1704]

On or about September 28, 2017, in Los Angeles County, within the Central District of California, defendant MARLON PALCONIT RAMOS knowingly possessed with the intent to unlawfully and improperly use, and to cause the same to be unlawfully and improperly used, keys suited to locks adopted and in use at the time by the United States Post Office Department and Postal Service, and to any authorized receptacle for the deposit or deliver of mail matter, namely, two counterfeit Postal Service "arrow" keys.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**TRISTANY L. WAGNER**<br>OFFICIAL TITLE<br>Postal Inspector |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE [1] | DATE<br>October 19, 2017 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Chelsea Norell ext. 2624   REC: Detention

## AFFIDAVIT

I, Tristany L. Wagner, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for MARLON PALCONIT RAMOS ("RAMOS") for a violation of Title 18, United States Code, Section 1704 (Unlawful Possession of Postal Keys).

2. This affidavit is also made in support of an application for a warrant to search six digital devices (collectively, the "RAMOS DEVICES") seized from RAMOS on or about September 28, 2017, as described more fully in Attachment A, which is incorporated by reference. The requested search warrant seeks authorization to seize any data on the RAMOS DEVICES that constitute evidence, fruits, and instrumentalities of the following statutes, as described more fully in Attachment B, which is also incorporated by reference: Title 18, United States Code, Sections 1704 (Unlawful Possession of Postal Keys), 1708 (Mail Theft and Possession of Stolen Mail), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1028A (Aggravated Identity Theft), 1344 (Bank Fraud), 371 (Conspiracy), and 922(g)(1) (Felon in Possession of a Firearm and Ammunition).

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel.

This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF POSTAL INSPECTOR TRISTANY L. WAGNER

4.  I am a Postal Inspector employed by the United States Postal Inspection Service ("USPIS") and have been so employed since April 2016. I have completed a 12-week basic training course in Potomac, Maryland, which included training in the investigation of mail theft. I am currently assigned to the Alameda Mail Theft team, where my responsibilities include the investigation of crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of the United States mail, possession of stolen mail, and crimes related to the use, theft or counterfeiting of postal keys (referred to as "arrow keys"[1]) and locks. I also investigate crimes in connection with access devices that include credit cards and debit cards, identity theft, and the unauthorized use of other persons' information for financial gain, as these criminal schemes often are perpetrated through the United States mail.

---

[1] A USPS "arrow" key is a key with a proprietary design that is used to open secured mail receptacles. A counterfeit arrow key enables a user to open a secured mail receptacle, leaving little or no visible evidence of entry.

III. **SUMMARY OF PROBABLE CAUSE**

5. On or about September 28, 2017, Los Angeles Police Department ("LAPD") officers were conducting patrol in the parking lot of the Royal Pagoda Motel, when they saw a grey Mercedes ("the Mercedes") with paper plates. During this time, RAMOS and Daniela Otero ("Otero") approached the Mercedes. Officers asked RAMOS if the Mercedes was his, and RAMOS said it was his friend's, but he was unable to provide the owner's full name. When asked if RAMOS had any weapons on him, he said that he had a knife, which was clipped to RAMOS's front right pant pocket in plain view. Officers removed the knife for officer safety, and upon doing so, realized it was a spring-loaded switch blade, which is illegal to possess under California law. RAMOS was arrested and officers searched the backpack on RAMOS's backpack, which contained mail, credit cards, debit cards, and checks in names other than RAMOS or Otero, as well as two counterfeit arrow keys, and a counterfeit identification card with a photograph that appeared to be RAMOS. RAMOS told the officers that he had a room at the motel, and he consented in writing to a search of his room. In his room, the officers found a loaded 9mm Ruger handgun containing nine live rounds, 36 additional live rounds, a Smith and Wesson 9mm magazine containing 10 live rounds, mail addressed to individuals other than RAMOS or Otero, a counterfeit arrow key, credit card readers, a credit card embosser, and the RAMOS DEVICES.

3

## IV. STATEMENT OF PROBABLE CAUSE

6. Based on my own observations and participation in this investigation, my review of LAPD reports regarding the events described below, and my conversations with LAPD officers, I know the following:

**A. The Arrest on or about September 28, 2017**

7. On or about September 28, 2017, at approximately 10:00 p.m., LAPD Officers Lyman and Moore were conducting patrol in an unmarked police vehicle with emergency lights. The officers were in the parking lot of the Royal Pagoda Motel, located at 955 North Broadway, Los Angeles, CA 90012, when the officers saw the Mercedes in the back of the lot with paper plates. The officers knew from their training and experience that paper plates are a common tool used by car thieves to avoid detection while driving stolen cars. During this time, RAMOS and Otero exited the motel courtyard and approached the Mercedes. RAMOS unlocked the Mercedes with a key, and Otero entered on the passenger side.

8. Officers Lyman and Moore approached RAMOS, and asked him if the car was his. RAMOS told the officers that it was his friend's car that he borrowed, but RAMOS was unable to tell the officers the owner's full name. Officer Moore asked RAMOS if he had any weapons on his person and if he was on parole or probation. RAMOS told the officers that he had a knife on him. The knife was clipped to RAMOS's front right pants pocket in plain sight. For officer safety, Officer Moore removed the knife from RAMOS's pants pocket, and immediately realized that

4

that it was a spring-loaded switch blade knife, in violation of California Penal Code Section 21510. RAMOS was arrested without incident.

9. The officers searched a maroon backpack that RAMOS was carrying, incident to the arrest. They found two counterfeit arrow keys, a California Driver's License in the name of J.F., mail, credit and debit cards in the names of other individuals, and a counterfeit California Driver's License with the name M.B. and a photograph depicting RAMOS. One of the access devices, an American Express credit card, appeared to have the name M.B. embossed on it next to the name T.W. A second American Express credit card was also in the name M.B. The officers also found a money order and checks, one of which appeared to be washed with RAMOS's name written in the payee line. The officers also found a Smith and Wesson firearm magazine, a Smith and Wesson manual, a magazine loader, paperwork for the Smith and Wesson gun in the name of R.S., a magazine loader, and pliers, among other items. At this time, officers requested additional units to assist with the investigation, and Officers Mia, Lewis, Marquez, and Sergeant Hawng arrived on scene.

**B. The Search of RAMOS's Motel Room**

10. RAMOS told officers that he was staying at the Royal Pagoda Motel and that the room was in his name. Officer Mia asked for consent to search RAMOS's hotel room, verbally advised RAMOS of his right to refuse consent, and gave him the LAPD

5

Consent to Search form, which RAMOS signed, giving the officers consent to search his motel room.[2]

11. In the motel room, the officers found the following:

a. A loaded 9mm Ruger handgun, serial number 33080029, lying on the bed underneath a sheet and pillow, with nine live rounds in the magazine;

b. A box in the nightstand next to the bed that contained an additional 36 rounds of live ammunition, and a Smith and Wesson 9mm magazine containing 10 live rounds;

c. A large amount of opened and unopened mail in names other than RAMOS and Otero in the corner adjacent to the desk;

d. A card embosser, two printers, and the RAMOS DEVICES on top of the desk;

e. Inside the desk drawer, approximately 46 checks, one addressed to RAMOS, and another addressed to M.B., approximately 25 credit and debit cards belonging to individuals other than RAMOS or Otero, three which appeared to have M.B. embossed on them, two California Driver's licenses and a Global Entry card belonging to individuals other than RAMOS or Otero, miscellaneous paperwork containing personal identifying information for individuals other than RAMOS or Otero, a black notebook containing personal identifying information for individuals other than RAMOS or Otero, and approximately 54 keys, one of which was a counterfeit arrow key; and

---

[2] RAMOS made other statements to LAPD officers, some or all of which were spontaneous; however, the government does not rely on those statements for its showing of probable cause.

   f. A Paypal card reader and a Deftun card reader/writer/encoder in a backpack in the closet of the hotel room. Based on my training and experience, I know that a Deftun card reader/writer/encoder is commonly used by identity thieves and those committing access device fraud to read credit cards and encode the strips of access devices with different card information.

  **C.** **RAMOS's Criminal History**

  12. On October 2, 2017, I reviewed a National Crime Information Center ("NCIC") criminal history report criminal history transcript of RAMOS. Based on the my review of these databases and records, I am aware of the following felony conviction:

   a. On or about August 3, 2011, defendant RAMOS was convicted of a violation of 18 U.S.C. § 1704, unlawful possession of a counterfeit postal key, in case number 2:09-CR-01127-RGK, in the Central District of California.

**V. TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT**

  13. Based on my training and experience, including being a member of a USPIS Mail Theft Team, and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

   a. Persons who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can

7

use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

    b. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to use digital devices. Such digital devices are often used to facilitate, conduct, and track their fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as Social Security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices. It is also common for mail and identity thieves to use digital devices to store information related to their identity theft crimes long after the crimes have been committed.

    c. Often, mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their

8

cellphones. It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

    d. Individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos of stolen mail and related items. These individuals also maintain telephone numbers, email addresses, and other contact information for their co-conspirators on their digital devices.

## VI. TRAINING AND EXPERIENCE REGARDING ARROW KEYS

  14. Based on my training and experience, including being a member of the Mail Theft Team, and information I have obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

    a. USPS "arrow keys" are used by USPS mail carriers to unlock USPS "arrow locks" in order to (i) gain access to housing complexes or apartment buildings, and (ii) deliver mail to the respective mailboxes found therein (most commonly found in a mailbox panel). USPS arrow keys are also sometimes used to gain access to mail collection boxes in a specific area. In my training and experience, I have also learned that non-postal

9

employees and mail thieves refer to arrow keys as "skeleton keys" or "shaved keys."

   b. Mail thieves typically use stolen or counterfeit arrow keys to gain access to housing complexes or apartment buildings in order to steal mail from numerous mailboxes. Mail thieves also steal USPS arrow locks to make counterfeit arrow keys through reverse engineering. Mail thieves make counterfeit arrow keys using a variety of tools, including Dremel tools. As a result of stealing mail, mail thieves can gain access to such items as checks, money orders, cash, and gift cards, as well as individuals' personal information, and use such information to commit bank fraud, check fraud, and access device fraud with credit cards and debit cards.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

15. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

   a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific

expertise in the type of digital device, operating system, and software application being searched.

   b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

   c.   It is difficult to estimate the precise storage space contained on the devices listed in Attachment A before conducting a preliminary examination of the devices, but, based on my training and experience, I know that laptops and cellular telephones can contain multiple gigabytes of storage space. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

   d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[3] Electronic files saved to a hard drive can be stored for years

---

[3] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

11

with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and user habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

      e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital

devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the digital device was in use.  Digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized

tools and a controlled laboratory environment, and also can require substantial time.

  f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

  g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a

14

process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

    h.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII. CONCLUSION

16. For all the reasons described above, there is probable cause to believe that MARLON RAMOS has committed a violation of Title 18, United States Code, Section 1704 (Unlawful Possession of Postal Keys). Based on the foregoing facts, there also is probable cause to believe that the items listed in Attachment B,

//
//
//
//
//
//
//
//
//

which constitute evidence, fruits, and instrumentalities of violations of the offenses described above, will be found on the devices described in Attachment A.

_____
TRISTANY L. WAGNER
Postal Inspector
United States Postal
Inspection Service

Subscribed to and sworn before me
this 19th day of October 2017.

_____
UNITED STATES MAGISTRATE JUDGE